[No. H026443. Sixth Dist. Aug. 31, 2004.]

ARCHITECTURAL HERITAGE ASSOCIATION et al., Plaintiffs and Appellants, v.
COUNTY OF MONTEREY et al., Defendants and Respondents.

## COUNSEL

Brandt-Hawley Law Group, Susan Brandt-Hawley and Paige J. Swartley for Plaintiffs and Appellants.

Carolyn Douthat for California Preservation Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Charles J. McKee, County Counsel, and Efren N. Iglesia, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**McADAMS, J.**—This appeal presents a challenge to the adoption of the mitigated negative declaration under CEQA, the California Environmental Quality Act.[1] Under the standard that governs our review here, we conclude that the challenge has merit. We therefore reverse the judgment.

### INTRODUCTION

This dispute involves Monterey County's Old Jail, located in Salinas, California. The County of Monterey (County) intends to demolish the Old

---

[1] CEQA is codified in the Public Resources Code, starting at section 21000. Further unspecified section references are to that code.

Jail. Acting through its board of supervisors, the County decided to proceed under CEQA by way of a mitigated negative declaration. Plaintiffs Architectural Heritage Association and Mark Norris challenge that decision. According to plaintiffs, there is evidence supporting a fair argument that the planned demolition will result in loss of the jail's historic value and that the proposed mitigation measures are inadequate. Plaintiffs have pressed their claims both administratively and judicially.

To provide perspective for the procedural and substantive aspects of this dispute, we begin with an overview of CEQA.

## STATUTORY BACKGROUND

CEQA embodies our state's policy that "the long-term protection of the environment . . . shall be the guiding criterion in public decisions." (§ 21001, subd. (d); see *Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112 [62 Cal.Rptr.2d 612].) As this court recently noted, "the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage. [Citation.]" (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 [104 Cal.Rptr.2d 326].) As an aid to carrying out the statute, the State Resources Agency has issued a set of regulations, called Guidelines for the California Environmental Quality Act (Guidelines).[2] Together, CEQA and the Guidelines protect a variety of environmental values. Historic resources are among them. (See § 21084.1; Guidelines, § 15064.5; *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 183–184, 185 [105 Cal.Rptr.2d 214, 19 P.3d 567].)

Consistent with California's strong environmental policy, the statute and regulations "have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 112; see also *Friends of Sierra Madre v. City of Sierra Madre, supra,* 25 Cal.4th at p. 185; *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1371 [43 Cal.Rptr.2d 170].)

"The first tier is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity. (Guidelines, §§ 15060, 15061.)" (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 112.) "If the agency finds the project is exempt

---

[2] The Guidelines are located at title 14 of the California Code of Regulations, starting at section 15000. Further unspecified guideline references are to those regulations.

from CEQA under any of the stated exemptions, no further environmental review is necessary." (*Id.* at p. 113.) "If, however, the project does not fall within any exemption, the agency must proceed with the second tier and conduct an initial study. (Guidelines, § 15063.)" (*Ibid.*)

The second tier of the process, the initial study, serves several purposes. (Guidelines, § 15063, subd. (c).) One purpose is to inform the choice between a negative declaration and an environmental impact report (EIR). (*Id.,* subd. (c) (1); *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1346 [272 Cal.Rptr. 372].) Another of the initial study's purposes is to eliminate unnecessary environmental impact reports. (Guidelines, § 15063, subd. (c)(7).)

"CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial evidence that the project may have a significant effect on the environment." (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389–390 [83 Cal.Rptr.2d 836], citing Guidelines, § 15070; see also §§ 21064, 21080, subd. (c); *Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1347.)

In certain situations where a straightforward negative declaration is not appropriate, the agency may permit use of a mitigated negative declaration (MND). "If the initial study identifies potentially significant effects on the environment but revisions in the project plans 'would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur' and there is no substantial evidence that the project as revised may have a significant effect on the environment, a mitigated negative declaration may be used." (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist., supra,* 71 Cal.App.4th at p. 390, quoting § 21064.5; see also, e.g., *Citizens' Com. to Save Our Village v. City of Claremont* (1995) 37 Cal.App.4th 1157, 1167 [44 Cal.Rptr.2d 288]; Guidelines, § 15064, subd. (f)(2).)

If the project does not qualify for a negative declaration of either type, "the third step in the process is to prepare a full environmental impact report . . . ." (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 113, citing §§ 21100 and 21151, and Guidelines, §§ 15063, subd. (b)(1), and 15080; *Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at p. 1372.)

The California Supreme Court has "repeatedly recognized that the EIR is the 'heart of CEQA.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502].) As the court observed some three decades

ago, "since the preparation of an EIR is the key to environmental protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66].) The court stressed "the importance of preparing an EIR in cases . . . in which the determination of a project's environmental effect turns upon the resolution of controverted issues of fact and forms the subject of intense public concern." (*Ibid.*) Other cases have since confirmed the statutory preference for resolving doubts in favor of an EIR. (See, e.g., *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 703 [7 Cal.Rptr.3d 868]; *League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 905 [60 Cal.Rptr.2d 821] (*City of Oakland*).)

With that overview of CEQA in mind, we now turn to the facts underlying this proceeding.

## FACTUAL AND PROCEDURAL BACKGROUND

At the heart of this dispute is the County's Old Jail, built in 1931 in the Gothic Revival style. The three-story structure was designed by Reed & Corlett, an architectural and engineering firm "responsible for numerous buildings in the San Francisco Bay Area from 1912 to 1933, many of which are still standing." The jail is located directly adjacent to the Monterey County courthouse, at 142 West Alisal Street in Salinas. The building is approximately 40 feet tall, with some 19,000 square feet of floor space. It consists of two primary wings, which are separated by a secured passageway. The original blueprints for the jail provided for a number of uses, some quite outmoded under current penal practices. The plans thus included a boys' department, vagrants' quarters, an insane cell, a padded cell, a delousing room, a darkroom, and a room for liquor storage. Some of the jail cells "contain detailed and artistic graffiti done by prisoners."

In December 1970, César Chávez was incarcerated in the Old Jail for approximately two weeks, for refusing to obey a court order to halt the United Farm Workers' lettuce boycott. His incarceration drew international attention, prompted visits from Coretta Scott King and Ethel Kennedy, and galvanized the burgeoning farm worker movement.

By the 1980's, the County had ceased using the structure as a jail. Since then, it has been used for records storage and as a temporary holding facility for prisoners appearing in court.

In December 1999, by unanimous vote of its Board of Supervisors, the County directed its staff "to take necessary actions to provide for demolition of [the] old jail facility in Salinas."

Various assessments of the jail preceded and followed the County's decision to demolish the structure.

### Assessments of the Old Jail

#### 1. Physical Condition

Several reports commissioned by the County evaluated the jail's physical condition. A 1998 report noted the presence of asbestos and lead-based paint at the Old Jail. In August 2000, a property condition report on the Old Jail was prepared by Professional Service Industries, Inc. (PSI). Among other things, PSI's property condition report concluded that the roofs were in poor condition and that the building did not comply with the Americans with Disabilities Act. In September 2000, an indoor air quality evaluation revealed high levels of mold spores and lead dust in most locations in the building.

#### 2. Historic Status

The County also commissioned an assessment of the Old Jail as a cultural and historic resource. Dr. Robert Cartier of Archaeological Resource Management undertook that assessment, which was completed in July 2000. Cartier holds baccalaureate, graduate, and doctoral degrees in anthropology, and he has more than two decades of full-time experience in researching, interpreting, and writing about cultural and historical resources. In a section of the report detailing the jail's factual history, Cartier noted that it "was visited by some notable historical figures" and he specifically mentioned the 1970 jailing of César Chávez.

In his evaluation of the jail's cultural significance, Cartier stated: "A cultural resource is considered 'significant' if it qualifies as eligible for listing in the California Register of Historic Resources (CRHR). Properties that are eligible for listing in the CRHR must meet one or more" of four criteria, which he set forth in the report.[3] The second factor (criterion 2) is particularly relevant here: "Association with the lives of persons important to local,

---

[3] According to Cartier, eligibility for listing on the CRHR is limited to property that meets one or more of the following four criteria:

"1. Association with events that have made a significant contribution to the broad patterns of local or regional history or the cultural heritage of California or the United States;

"2. Association with the lives of persons important to local, California, or national history;

"3. Embodying the distinctive characteristics of a type, period, region, or method of construction, or representing the work of a master, or possessing high artistic values; or

California, or national history." Cartier observed that the Old Jail "is not currently listed on the California Register of Historic Resources. The jail structure does appear, however, to qualify as potentially eligible for listing on the CRHR under criterion 2 . . . ."

The Cartier report also set forth the four parallel criteria for listing on the National Register of Historic Places (NRHP).[4] Again, the second criterion is most pertinent here. That factor, criterion b, applies to places "associated with the lives of persons significant in our past." As with the state registry, Cartier observed, the Old Jail "is not currently listed on the National Register of Historic Places. However, this structure does appear to qualify as potentially eligible for listing on the National Register under criterion B . . . ."

Near the end of his report, Cartier stated: "Due to the historic significance of the structure, several alternative mitigations are outlined below." The listed mitigations include: (1) retention and adaptation of the structure, though that "may be impractical due to its age and condition"; (2) photographic documentation to historic survey standards;[5] (3) preparation of an historic monograph; (4) reuse of architectural elements from the building; and (5) maintaining the architectural blueprints at the local historical society.

In September 2000, County staff submitted the reports to the County Board of Supervisors.

### Administrative Proceedings Under CEQA

In November 2000, the County's Office of Capital Projects applied for a demolition permit for the Old Jail. Application was made to the County's Planning and Building Inspection Department (Department). Although the Department's director believed that issuance of the demolition permit was exempt under CEQA, the Department nevertheless reviewed and processed

---

"4. Has yielded, or has the potential to yield, information important to the prehistory or history of the local area, California, or the nation."

See section 5024.1, subdivision (c); Guidelines, section 15064.5, subdivision (a)(3).

[4] According to Cartier, eligibility for listing on the NRHP is limited to property that meets one or more of the following four criteria:

"a. that are associated with events that have made a significant contribution to broad patterns of our history;

"b. that are associated with the lives of persons significant in our past;

"c. that embody distinctive characteristics of type, period, or method of construction, or that represent the work of master, or that possess high artistic values, or that represent a significant or distinguishable entity whose components may lack individual distinction;

"d. that have yielded, or are likely to yield, information important in prehistory or history."

See 36 Code of Federal Regulations part 60.4.

[5] The identified standards are those of the Historic American Building Survey (HABS).

the application under the Act "out of an abundance of caution and in order to be responsive to concerns that the jail is an historic resource."

### 1. *The Initial Study*

On June 1, 2001, an initial study was completed.

The initial study identified several environmental factors potentially affected by demolition of the Old Jail, including cultural resources. With respect to that aspect, the research underlying the initial study "focused on the structure's characteristics and its contribution to the historic fabric of the City of Salinas and the County of Monterey." The initial study noted Cartier's conclusion that the Old Jail "qualifies as potentially eligible for listing on both the CRHR and the National Register." The initial study then concluded: "Consequently, the old jailhouse is a significant historical resource as defined by CEQA [Guidelines] Section 15064.5."

The initial study stated: "Without appropriate and extensive mitigation, the proposed demolition will cause a substantial adverse change to an historic resource." But it also noted that "the architectural integrity of the resource has been diminished by the deteriorated physical condition of the structure and the hazardous materials that are found extensively within" its components. Based on those factors, the initial study stated, "renovation or reuse of the structure is not feasible. However, the demolition of the building represents an incremental loss of both the architectural style of 1930s jail construction and an historic resource potentially eligible for listing on both the California Register of Historic Resources and the National Register of Historic Places. Without appropriate mitigation, the demolition would have impacts that are cumulatively considerable when viewed in connection with the effects of past demolitions of architecturally significant and historically significant structures within the state. However, extensive mitigation measures have been developed to reduce these potential impacts to a less than significant level." To a large extent, the listed mitigations mirror those in Cartier's report. They include photographic documentation to historic survey standards, production of an historic monograph, reuse or duplication of architectural elements from the building, and filing a complete set of architectural blueprints at the local historical society.

Ultimately, the initial study concluded, with the proposed mitigations, the adverse environmental effects on cultural resources from demolition of the Old Jail will be less than significant. Based on that conclusion, the initial study called for preparation of a mitigated negative declaration.

### 2. *The Mitigated Negative Declaration*

On June 14, 2001, the County gave notice of its intent to adopt a mitigated negative declaration.

Public comments were received in response. One was from the County's Historic Resources Review Board (Historic Board). The members of the Historic Board were "unanimous in their opinion that the draft Initial Study is insufficient upon which to address mitigation measures and recommend the County undertake a more extensive [EIR]." A memorandum from the Historic Board's jail subcommittee likewise recommended an EIR. In addition, Historic Board member Dorothy Steele Laage, acting in her personal capacity as a "concerned citizen of Monterey County," wrote in support of a full EIR. The comment period on the mitigated negative declaration ended on July 16, 2001.

A public hearing followed nearly a year later. It began on June 19, 2002. Those opposed to issuance of the demolition permit argued for preparation of an EIR, based on claims that the Old Jail is a cultural and historic resource. The hearing was continued to permit completion of an addendum to the historic monograph of the Old Jail, which had been prepared for the County by Carey & Company. At the continued hearing, held on July 3, 2002, the Department received additional testimony, further staff recommendations, and the third addendum to Carey & Company's monograph.

At the conclusion of the hearing, the Department adopted the mitigated negative declaration, together with a mitigation monitoring and reporting program, and it issued the demolition permit for the Old Jail. In order to mitigate the demolition's impact on the jail's value as an historic resource, the following conditions were imposed: photographic documentation to HABS standards; preparation of an historic monograph, including detailed descriptions of the jail's construction, the social environment in which it was built, its association with local, state, and national history, and jail culture; reuse or duplication of architectural elements from the building, with certain salvage details called out; and maintaining a complete set of the architectural and engineering blueprints at various agencies, including the local historical society.

### 3. *Plaintiffs' Administrative Appeal*

On July 12, 2002, plaintiff Architectural Heritage Association filed an appeal of the decision with the County's Board of Supervisors. As one of the grounds for its administrative appeal, Architectural Heritage Association argued that the mitigated negative declaration did not reduce the environmental impacts of demolishing the Old Jail to a level of insignificance.

The appeal was heard on July 30, 2002. At the conclusion of that hearing, County's Board of Supervisors denied the appeal and affirmed the Department's decision adopting the mitigated negative declaration.

### Judicial Proceedings

On August 27, 2002, plaintiffs Architectural Heritage Association and Mark Edwin Norris filed a petition for writ of mandate, naming as respondents the County of Monterey and its board of supervisors. The petition asserted that the County's decision to certify the MND constituted a violation of CEQA. Both sides filed briefs with the trial court in advance of the hearing on the petition, which was set for May 2003. Both sides also proffered additional evidence. The County requested the court to take judicial notice of federal regulations and bulletins concerning standards for inclusion on the National Register of Historic Places. Plaintiffs submitted a declaration from their attorney, which reported on a public meeting of the California State Historical Resources Commission held in February 2003 to consider a determination that the Old Jail was eligible for listing on the National Register of Historic Places. The declaration included the attorney's unofficial transcription of a portion of the hearing. The County objected to consideration of that evidence, urging "(1) it is not relevant, (2) it lacks the requisite foundational showing of relevancy and for an exception to the general rule against admission of extra-record evidence, (3) it contains objectionable hearsay, and (4) it pertains to another agency's proceedings which are as yet not completed and not probative of the issues in the present proceeding." In their response to the County's objections, plaintiffs submitted the official minutes of the February 2003 hearing, together with a certified transcript of the hearing, and they requested "judicial notice or record augmentation" as to each.

On May 1, 2003, the petition for writ of mandate was heard in Superior Court. The court first received the administrative record, which consists of five volumes. The court next granted the County's request for judicial notice of the federal regulations and bulletins. The court then took up plaintiffs' request for judicial notice of the minutes and transcript of the February 2003 meeting, at which the state Historical Resources Commission unanimously determined that the Old Jail met register criteria and was eligible for listing on both the National Register of Historic Places and the California Register of Historical Resources. After discussion with both sides, the trial judge announced: "I will take judicial notice as requested." The court then entertained argument on the petition. At the conclusion of the hearing, the court took the matter under submission.

On May 14, 2003, the court issued its ruling denying the writ petition. In its written decision, the court reviewed the evidence and the parties' general

arguments. It then set forth the standard of review, stating: "The law requires that where substantial evidence supports a 'fair argument' that a project may have a significant effect on the environment, an EIR must be prepared, unless adopted mitigation measures can reduce the environmental impacts to a level of insignificance." The court then analyzed plaintiffs' claim "that the administrative record contains material from which a fair argument can be made that the jail should be deemed an historic structure." It stated: "The importance of César Chávez and the events surrounding his leadership in the farm labor movement are historic. Whether the event of his jailing is sufficient to make the entire building itself historic is another question." The court went on to say: "César Chávez leaves an historic legacy because of his many years of toil and leadership on behalf of the farm labor movement. His two week connection with the jail represents just one segment of a lifetime effort. The real question is whether the mitigation measures adopted by [the County] will appropriately preserve the historic attributes of that two week period of César Chávez's life." The court concluded that they would. It said: "The record supports the finding that, to the extent the jail is seen to have historic attributes, the mitigation efforts undertaken have reduced those attributes to less than significant levels." The court therefore denied the petition for writ of mandate.

Judgment was entered the following month. Plaintiffs moved for a new trial, arguing that the court had applied the wrong standard of review. In August 2003, the court denied that motion.

This appeal followed.

## ISSUES

*Contentions*

Plaintiffs assert (1) demolition of the Old Jail is subject to CEQA; (2) the evidence supports a fair argument that demolition may have a significant impact on an historic resource and that the impact has not been adequately mitigated; and (3) the County impermissibly segmented the project. Appearing as amicus curiae, the California Preservation Foundation supports plaintiffs' bid for a full environmental impact report.

The County counters (1) the record does not contain substantial evidence supporting a fair argument that the Old Jail is historic; (2) even if the Old Jail is an historic resource, the mitigation measures are adequate; and (3) plaintiffs failed to raise and exhaust their segmentation claim, which lacks merit in any event.

*Questions Presented*

As distilled by the parties' briefs, the substantive issues presented are (1) whether the Old Jail is an historic resource, (2) whether its demolition will have a significant environmental impact, and (3) whether the proposed mitigation measures are adequate to reduce that impact to insignificance. The briefs also discuss segmentation, but our resolution of the other questions obviates the need to analyze that issue.

## DISCUSSION

Before addressing the substantive questions presented, we first discuss three threshold issues that frame and govern our analysis.

I. *Threshold Issues*

A. *Standard of Review: The "Fair Argument" Test*

■ Judicial review of an agency's efforts to comply with CEQA " ' "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination is not supported by substantial evidence." ' " (*City of Oakland, supra,* 52 Cal.App.4th at pp. 903–904.) When there is substantial evidence supporting a fair argument that the project will significantly impact the environment, an agency abuses its discretion in failing to require an EIR. (*Id.* at p. 905; *Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at p. 1412.)

■ Thus, in reviewing the adoption of a negative declaration, the concern of both trial courts and appellate courts "is whether there is substantial evidence in the record supporting a fair argument of significant environmental impact." (*Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1348; see *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 6 Cal.4th at p. 1123; Guidelines, § 15064, subd. (f)(1).) In this case, the fair argument standard applies to all three substantive issues—historicity, impact, and mitigation—since they all bear on the question of whether an EIR is required. (See *City of Oakland, supra,* 52 Cal.App.4th at p. 905.) "Whether a fair argument can be made is to be determined by examining the entire record." (*Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1348.) The sufficiency of the evidence to support a fair argument presents a question of law. (*City of Oakland, supra,* 52 Cal.App.4th at p. 905.)

" 'In the CEQA context, substantial evidence is "enough relevant information and reasonable inferences from this information that a fair argument can

be made to support a conclusion, even though other conclusions might also be reached." ' " (*Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1348.) "Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (§ 21082.2, subd. (c); Guidelines, § 15384, subd. (b).) "If such evidence is found, it cannot be overcome by substantial evidence to the contrary. [Citations.]" (*Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1348; accord, *Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at p. 1400; and see Guidelines, § 15384, subd. (a); but see *Citizens' Com. to Save Our Village v. City of Claremont, supra,* 37 Cal.App.4th at p. 1168.)

■ The "fair argument" test is very different from the usual measure of judicial deference given to agency decisions. (Cf., e.g., *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817, 824 [85 Cal.Rptr.2d 696, 977 P.2d 693] [in administrative mandamus action, the trial court exercises its independent judgment but nevertheless "must afford a strong presumption of correctness" to administrative findings; appellate court reviews for substantial evidence].) The fair argument test has limited application. It "was derived from an interpretation of the language of, and policies underlying, section 21151 itself. For this reason, the 'fair argument' test has been applied *only* to the decision whether to prepare an original EIR or a negative declaration. [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 6 Cal.4th at p. 1135.)

"This test establishes a low threshold for initial preparation of an EIR, which reflects a preference for resolving doubts in favor of environmental review. [Citation.]" (*Santa Teresa Citizen Action Group v. City of San Jose, supra,* 114 Cal.App.4th at p. 703.)

### B. *Scope of Review*

■ Judicial review for evidence of a fair argument is undertaken "by examining the entire record." (*Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1348.) In this context, that means the entire administrative record. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Citizens' Com. to Save Our Village v. City of Claremont, supra,* 37 Cal.App.4th at p. 1169; see generally Kostka & Zischke, Practice Under the California Environmental Quality Act (Cont.Ed.Bar 3d ed. 2003) §§ 23.45–23.55, pp. 963–974.)

The appellate record in this case contains material beyond that included in the administrative record. First, the trial court received extra-record evidence.

At the hearing on the petition for writ of mandate, the trial court admitted evidence that was not before the County when it adopted the MND. Specifically, the court received evidence that the state Historic Resources Commission had determined that the Old Jail was eligible for inclusion on the National Register of Historic Places. The record below thus includes evidence beyond that contained in the administrative record. Similarly, on appeal, both parties have requested us to take judicial notice of evidence of subsequent events involving that determination.[6] In addition, amicus curiae has filed an appellate brief with exhibits containing extra-record evidence.[7]

■ Notwithstanding the existence of additional evidence in the appellate record, review is properly limited to that contained in the administrative record, as we advised the parties prior to oral argument. As the California Supreme Court recently recognized, in various "parts of CEQA the Legislature has expressly stated that the existence of substantial evidence depends solely on the record before the administrative agency. For example, in considering whether an environmental impact report must be prepared, the lead agency must determine whether there is 'substantial evidence *in light of the whole record*' before indicating the project may have a 'significant effect on the environment.' (Pub. Resources Code, §§ 21080, subds. (c) & (d), 21082.2, subds. (a) & (d), italics added.)" (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 571.) The provision at issue here is one that limits review to the administrative record. The statute defining "mitigated negative declaration" refers to the absence of "substantial evidence in light of *the whole record before the public agency* that the project, as revised, may have a significant effect on the environment." (§ 21064.5, italics added; see *Citizens' Com. to Save Our Village v. City of Claremont, supra,* 37 Cal.App.4th at p. 1169.)

■ In sum, we limit our review to evidence in the administrative record. "Although a reviewing court may take judicial notice of matters not before the trial court," as we did here, "the reviewing court need not give effect to such evidence." (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261]; see also *Windham at*

---

[6] Collectively, the parties made six requests for judicial notice, all in 2004. Plaintiffs' initial request was made in February; they made supplemental requests in April and August. The County's initial request was made in March, followed by supplemental requests in May and June. Broadly speaking, all six appellate requests for judicial notice relate to the Old Jail's postjudgment nomination for placement on the National Register of Historic Places. We granted the first five requests, but denied the sixth (plaintiffs' second supplemental request), having by then already advised the parties that we did not intend to consider extra-record evidence.

[7] We granted leave to the California Preservation Foundation to appear as amicus curiae. Appended to its letter brief are five exhibits. Four contain extra-record evidence concerning the jail; the fifth is a bulletin published by the National Register of Historic Places entitled "How to Apply the National Register Criteria for Evaluation."

*Carmel Mountain Ranch Assn. v. Superior Court* (2003) 109 Cal.App.4th 1162, 1173, fn. 11 [135 Cal.Rptr.2d 834].) It would be improper to give effect to extra-record evidence in this case. We therefore disregard all evidence of events postdating the administrative proceedings, as contained in the parties' requests for judicial notice, both here and below, and in the exhibits to the brief of amicus curiae.

### C. Burden of Proof

■ Plaintiffs bear the burden of proof with respect to the three substantive questions we address here. With respect to the first two issues: "The burden is on the petitioner to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact. [Citations.]" (*City of Oakland, supra,* 52 Cal.App.4th at p. 904.) Plaintiffs thus must cite evidence in the record supporting a fair argument of (1) historic status and (2) environmental impact. ■ With respect to the third issue: "Upon the issuance of an MND, the project opponent must demonstrate by substantial evidence that the proposed mitigation measures are inadequate and that the project as revised and/or mitigated may have a significant adverse effect on the environment." (*Citizens' Com. to Save Our Village v. City of Claremont, supra,* 37 Cal.App.4th at p. 1167; accord, *San Bernardino Valley Audubon Society v. Metropolitan Water Dist., supra,* 71 Cal.App.4th at p. 390.)

Summarizing the three threshold issues, (A) we apply the fair argument standard to all three substantive issues presented—historicity, impact, and mitigation; (B) we limit our review to the administrative record; and (C) we consider whether plaintiffs have carried their burden. With the foregoing principles in mind, we turn to the substantive issues presented by this appeal.

### II. Analysis

As we explain below, we conclude that plaintiffs have carried their burden of showing substantial evidence in the administrative record supporting a fair argument (A) that the Old Jail is an historic resource, (B) that its demolition will have a significant environmental impact, and (C) that the proposed mitigation measures are inadequate to reduce that impact to insignificance. In light of those conclusions, we do not reach the question of segmentation.

### A. Historic Status

According to plaintiffs, there is adequate evidence supporting a fair argument of historicity in the initial study alone. But they also cite other evidence, including the Cartier report, the Historic Board recommendation for

a full EIR, and comments by speakers at the public hearings. The County discounts the substantiality of the cited evidence to support plaintiffs' historic status claim.

Our examination of the record persuades us that the "fair argument" test is satisfied here.

### 1. *The Initial Study*

In the words of the initial study, "the old jailhouse is a significant historical resource as defined by CEQA [Guidelines] Section 15064.5."

The County attempts to discount that conclusion. It urges that "the sole basis" for the determination "is the same portion of the Cartier Report that places a heavy reliance on the Jail's association with César Chávez as a ground for deeming the Jail a historic resource." According to the County, "that part of the Cartier Report has very little evidentiary value" because of "its failure to discuss the federal criteria applicable to historic resources that may have gained significance within the last 50 years . . . ." On that basis, the County rejects the notion that the initial study constitutes substantial evidence supporting a fair argument that the Old Jail is an historic resource.

We are not persuaded by the County's attempts to minimize the evidentiary force of the initial study. Under the low threshold that governs our review, the initial study incorporates " ' "enough relevant information and reasonable inferences from this information that a fair argument can be made" ' " that the Old Jail is an historic resource. (*Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1348.) Here, that information includes the initial study's nod to "the architectural style of 1930s jail construction" as well as its adoption of Cartier's conclusion that the structure is "potentially eligible" for listing on both the NRHP and the CRHR based on its social or cultural significance. As the initial study confirms: "The old jail is known to be associated with important persons in local, regional, or national history, including César Chávez who was incarcerated at the jail between December 10–24, 1970, for refusing to obey a court order to stop a lettuce boycott. Mr. Chávez was a major contributor to the Mexican-American community in the Monterey and Santa Clara Valley areas. In addition, Ethel Kennedy, the widow of Robert Kennedy, and Coretta Scott King, the widow of Dr. Martin Luther King, Jr., reportedly visited Chávez during his incarceration in the jailhouse." Based on those observations alone, there is a fair argument that the Old Jail is historic.

Moreover, our determination that there is substantial evidence supporting a fair argument of the jail's historic status is bolstered by an examination of the

administrative record as a whole. We therefore discuss some of the other evidence supporting plaintiffs' claim of historicity.

### 2. *The Cartier Report*

Cartier concluded that the jail "does appear . . . to qualify as potentially eligible for listing" on the California Register of Historic Resources and on the National Register of Historic Places under the second criterion of each. Cartier thus explicitly acknowledged the "historic significance of the structure . . . ."

■ As noted above, the County challenges the evidentiary value of Cartier's assessment of NRHP eligibility to the extent it is based on association with César Chávez. As before, however, we find that challenge unavailing. Eligibility for inclusion on the National Register is not determinative. The governing statute "does not demand formal listing of a resource in a national, state or local register as a prerequisite to 'historical' status. The statutory language is more expansive and flexible." (*City of Oakland, supra,* 52 Cal.App.4th at p. 907, citing §§ 21084.1 and 5020.1; see also Guidelines, § 15064.5, subd. (a)(4).)

The County also asserts: "From the standpoint of *architectural* or *physical* attributes, . . . the inescapable conclusion of the Cartier Report is that the Jail is *not* a historic resource." As the County correctly observes, Cartier did opine that the jail "does not display particularly rare or unique architecture" and that it "has a diminished architectural integrity" because of its physical deterioration. But those statements in the Cartier report do not rob it of its evidentiary value with respect to the *cultural* significance of the Old Jail.

In any event, other evidence in the administrative record supports a fair argument that the jail has architectural as well as cultural significance, including the initial study's reference to its style, submissions by the Historic Board, and comments by speakers at the public hearings.

### 3. *Historic Board*

In a memorandum dated July 5, 2001, the Old Jail subcommittee of the Historic Resources Review Board recommended against supporting the mitigated negative declaration. Citing the *City of Oakland* case, the memorandum expressed the view "that an EIR is required prior to the county's decision regarding demolition since the jail is a significant, historic resource as defined by CEQA." The memorandum noted that the subcommittee had toured the site, met with County staff, and studied many documents, including the original plans for the jail, the Cartier report, the property condition report,

and the initial study. The subcommittee opined: "The analytical record as a whole cannot support the demolition. It has in several areas been superficial."

Among other things, the subcommittee questioned Cartier's conclusion that the jail's structure and design are not particularly rare or unique, challenging "anyone to point out similar work in this county, either as a jail of that period or another building in this style." In its view, the jail "is a rare type and its castle like stylings will long recall its former use as a fortress of sorts." The subcommittee thus called into doubt Cartier's conclusion that the structure itself lacks architectural significance as an historic resource.

In its memorandum, the subcommittee also notes Cartier's references to César Chávez, then adds: "Other historically significant people will be found associated with the jail, such as prisoner Inez Garcia about whose case a book was written."

In July 2001, by unanimous vote following a scheduled public meeting, the Historic Board submitted the subcommittee's recommendation to the Department, thereby endorsing the view that the jail is an historic resource. In doing so, the Historic Board rejected the Department's recommendation that it adopt the mitigated negative declaration and approve the demolition permit.

The County attempts to minimize the finding of historic status by the Historic Board, employing a two-pronged attack. First, the County characterizes the Historic Board's finding as a "gratuitous conclusion" that carries no evidentiary weight, because it was made without conducting the specific type of public hearing envisioned by the Monterey County Code for the designation of historic resources. In addition, the County asserts, "conclusions reached by agency staff subordinate to agency decision makers on the ultimate issue of whether an impact is 'significant' do not constitute substantial evidence—they are merely inferences that may be disregarded."

We do not find either argument persuasive. As to the County's first point, we note that the Historic Board determination *was* made at a public hearing, at which review of the proposed MND was on the agenda—apparently at the request of the Department itself. Under the circumstances, we find nothing in the hearing process that diminishes the evidentiary force of the Historic Board's finding. As to its second point, the County supports its view that subordinate agency staff determinations lack evidentiary value by citing *Perley v. Board of Supervisors* (1982) 137 Cal.App.3d 424 [187 Cal.Rptr. 53]. We do not read *Perley* so broadly. The planning commission in *Perley* relied solely on the existence of public controversy and had no fact-based evidence upon which to base its opinion of significant environmental impact. (*Id.* at pp. 435–436.) *Perley* also predated the CEQA definition of substantial

evidence codified in 1993, which logically includes the fact-based opinions of agency staff and commissioners within the codified parameters of "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (§ 21082.2, subd. (c).) Here, the record includes fact-based evidence of historic status, which the Historic Board and its subcommittee had gained through meetings with County staff, a site view, and the review of pertinent documents.

In sum, we find the Historic Board's determination to be fact based and procedurally proper. It constitutes substantial evidence that the jail is historic.

### 4. *Speakers*

At the public hearing held by the Department in June and July 2002, a number of citizens voiced their opposition to the proposed mitigated negative declaration. Some stressed the social and cultural aspects of the jail's historic status; others spoke about its architectural significance; some addressed both features.

Sergio Sanchez was one of the speakers addressing the jail's cultural significance. He holds a state-level position with LULAC, the League of United Latin American Citizens. As Sanchez put it, the jail "means something to the farm workers of this community, there's a huge history of farm workers in this community that place has been documented in books and videos, photographs, where fifteen workers held vigil outside waiting for their leader to come out. Where such people as Ethel Kennedy, the widow of Robert Kennedy visited this jail, visited César Chávez in that jail. Coretta Scott King, the widow of Martin Luther King. Not many places can say that they got a visit not only from César Chávez, but they got visits from Ethel Kennedy and from Mrs. Coretta King." He stated: "It's not only a history of César Chávez but of the Latino community of this county that must be preserved and must be remembered."

Plaintiff Mark Edwin Norris addressed another aspect of the jail's cultural significance. Norris is a Salinas resident, a building designer, and a member of the Historic Board and its jail subcommittee. As part of his remarks, Norris mentioned Inez Garcia, another famous jail inmate, saying: "Her case has changed the face of women's rights in a very wide sense." Norris urged the County to postpone any decision to demolish the building "to allow the State office of Historic Preservation . . . to do an eligibility assessment and for the addition of interviews of former jail inmate[s], especially Inez Garcia . . . ."

Enid Sales also spoke. She is a certified historian, who was then serving both on the Historic Board and on its jail subcommittee. She opined that "an

EIR must be prepared for this notable historic resource." She commented on the association of the jail with "the perilous labor unrest in the Salinas Valley," and she urged its preservation "to the memory of this critical time in cultural and economic change" in the area.

Echoing that sentiment was Salvador Muñoz, the former cultural consul for Monterey County and another member of the Historic Board. Muñoz observed: "The old jail is a site where historical figures met at significant crossroads of local and national history. It is a symbol of our cultural heritage."

Muñoz, an architect, also spoke about the structure's architectural value. He referred to the Old Jail as "an architectural jewel and a symbol of its period of time." Muñoz further remarked that the Old Jail is "of a unique design, combining Art Deco elements and incorporating details from Gothic and Classical styles, completed [in] November 1931." He later reiterated: "It is an example of a very rare style in Salinas and Monterey County. The Art Deco, Gothic Revival and Classical Architecture." He further noted that the building "is an example of the pioneering technique which used *integrated-color* concrete in building."

Joel Panzer, a Salinas resident, characterized the jail as "the hub of Salinas" and remarked that its vintage was "probably at the same period of time" as "this courthouse building, the old jail, the Salinas Californian building and the post office, so you also have to look at that in context."

The County asserts that while "the speakers may have meant well, they are not experts on the subject that they testified about." Based on that assertion, the County characterizes the speakers' testimony as "at best, unsubstantiated opinions that do not rise to the level of substantial evidence."

We recognize that "substantial evidence" does not properly include argument, speculation, or unfounded opinions. (§ 21082.2, subd. (c); Guidelines, § 15384, subd. (a); *Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1352.) But we disagree with the County's characterization of the speakers' testimony as unsubstantiated opinion. For example, one of the speakers, Sales, is a certified historian; she linked the jail with "the perilous labor unrest in the Salinas Valley." Another speaker, Muñoz, is an architect; he noted that the jail is "a very rare style in Salinas and Monterey County." He also stated that the building exemplifies a "pioneering technique" in its use of integrated-color concrete. These and other speakers' remarks represent fact-based observations by people apparently qualified to speak to the question of the jail's historic status. That testimony constitutes substantial evidence, because it consists of "facts,

reasonable assumptions predicated upon facts, and expert opinion supported by facts." (§ 21082.2, subd. (c).)

Taken together, the following portions of the administrative record contain substantial evidence supporting a fair argument that the Old Jail is an historic resource, both culturally and architecturally: (1) the initial study, (2) the Cartier report, (3) the determination by the Historic Resources Review Board, and (4) the fact-based testimony of qualified speakers at the public hearing.

### B. *Demolition as a Significant Impact*

Having concluded that there is a fair argument supporting the jail's status as an historic resource, we next consider the effect of its proposed demolition.

 The pertinent legal question is whether demolition "may cause a substantial adverse change" to the jail's significance as an historical resource. (§ 21084.1.) "A project that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment." (*Ibid.*; see Guidelines, § 15064.5, subd. (b).) "Substantial adverse change in the significance of an historical resource means physical demolition" or other adverse effects, such that the significance of the historic resource "would be materially impaired." (Guidelines, § 15064.5, subd. (b)(1); see also § 5020.1, subd. (q) [same; CRHR definitions].) Material impairment occurs when a project alters or destroys "those physical characteristics of an historical resource that convey its historical significance and that justify its inclusion" in a state or local historic registry. (Guidelines, § 15064.5, subd. (b)(2)(A).)

Based on substantial evidence in the administrative record in this case, there can be little doubt that demolition will result in a substantial adverse impact on the jail. The initial study flatly states: "Without appropriate and extensive mitigation, the proposed demolition will cause a substantial adverse change to an historic resource." As the court recognized in *City of Oakland*: "The proposed demolition of the building can hardly be considered anything less than a significant effect." (*City of Oakland, supra,* 52 Cal.App.4th at p. 908.)

The County does not contend otherwise. Rather, it simply progresses to the next step in the analysis, the adequacy of the mitigation measures.

### C. *Mitigation*

 As explained above, adoption of a mitigated negative declaration is proper only where the conditions imposed on the project reduce its adverse

environmental impacts to a level of insignificance. (§ 21064.5; Guidelines, § 15064, subd. (f)(2).) By statutory definition, a mitigated negative declaration is one in which (1) the proposed conditions "avoid the effects or mitigate the effects to a point where *clearly* no significant effect on the environment would occur, *and* (2) there is *no substantial evidence* in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (§ 21064.5, italics added.)

Here, to mitigate the impact of demolition on the jail's historic significance, the County imposed the following conditions: (1) photographic documentation; (2) preparation of an historic monograph; (3) salvage of certain architectural elements; and (4) maintenance of a set of blueprints.

Plaintiffs contend that the proposed mitigation measures are not adequate. They assert: "As drawing a chalk mark around a dead body is not mitigation, so archival documentation cannot normally reduce destruction of an historic resource to an insignificant level." As support for that assertion, plaintiffs rely on *City of Oakland, supra,* 52 Cal.App.4th 896. The plaintiff in that case challenged a mitigated negative declaration adopted in connection with the planned demolition of Oakland's historic Montgomery Ward building. (*Id.* at p. 903.) The mitigation measures in the Oakland MND included "documentation of the structure in a report and survey, display of a commemorative plaque, and a new shopping center with design features which reflect architectural elements of the demolished building." (*Id.* at p. 909.) The court found the proposed mitigations insufficient, concluding that they did "not reduce the effects of the demolition to less than a level of significance. [Citation.]" (*Ibid.*) The court explained: "Documentation of the historical features of the building and exhibition of a plaque do not reasonably begin to alleviate the impacts of its destruction. A large historical structure, once demolished, normally cannot be adequately replaced by reports and commemorative markers. Nor, we think, are the effects of the demolition reduced to a level of insignificance by a proposed new building with unspecified design elements which may incorporate features of the original architecture into an entirely different shopping center." (*Ibid.*)

Countering plaintiffs' assertion of inadequate mitigation, the County cites three grounds for distinguishing *City of Oakland.* We are not persuaded by any of them.

The County's first ground for distinguishing *City of Oakland* rests on the fact that the Montgomery Ward building was listed as historic by the city itself in its own preexisting documentation. As we see it, however, that fact goes to the question of the building's historic status, not to the issue of mitigation. And in fact, the court mentioned that point under the heading

"The Montgomery Ward Building as a Historic Resource" and not in connection with its discussion of "Mitigation Measures." (*City of Oakland, supra,* 52 Cal.App.4th at pp. 908, 909.)

Second, according to the County, the Montgomery Ward building possessed structural architectural values while the Old Jail does not. As to that point, however, as we have explained above, we find substantial evidence in the administrative record to support a fair argument that the Old Jail has historic significance based on its architectural features, quite apart from its cultural associations. Furthermore, *City of Oakland* does not hold that historic status must always be based on architectural features. As discussed earlier, historic status may derive from other qualities as well. (See § 5024.1, subd. (c); Guidelines, § 15064.5, subd. (a)(3).)

As a third ground of distinction, the County claims that in *City of Oakland* "demolition did not appear to be appropriate as the Montgomery Ward Building was apparently in good condition; it had suffered no structural degradation even if it sustained slight damage in the 1989 Loma Prieta earthquake." (See *City of Oakland, supra,* 52 Cal.App.4th at p. 899.) While the court does mention the lack of structural degradation, it describes the Montgomery Ward building as having "fallen into severe disrepair, with peeling paint, broken windows, graffiti, and numerous code violations, including the presence of asbestos-containing materials." (*Ibid.*) Given that description, we find it difficult to accept the County's view that the court's decision was based in any way on the building's "good condition." In the same vein, we observe that the administrative record in this case does not support the County's determination that the Old Jail is in such poor condition that it requires demolition, a point we explore more fully below.

In short, we find no basis on which to distinguish *City of Oakland.* The analysis in that case is sound, and we apply it here. (See also, e.g., *San Bernardino Valley Audubon Society v. Metropolitan Water Dist., supra,* 71 Cal.App.4th at pp. 396–400.)

On this record, we find substantial evidence supporting a fair argument that the proposed mitigation measures are inadequate, in that they fail to reduce the environmental detriment "to a point where clearly no significant effect" will result. (§ 21064.5.)

D. *Need for an EIR*

Without undertaking a full EIR, the County determined that the jail could not be saved, finding that "its preservation or adaptive reuse is impractical due to its age, design, and deteriorating condition, and opening up the

building for more usable spaces would seriously degrade the structural integrity of the building and pose a safety hazard to its occupants and neighbors."

We find this determination insupportable, both factually and legally.

As a factual matter, the administrative record discloses mixed conclusions concerning the physical condition of the structure, as well as an incomplete investigation both of the jail's condition and of alternatives to demolition.

In the property condition report prepared by PSI in August 2000, limitations on access and the absence of detailed drawings prevented the evaluator from assessing some key areas of the structure. The unexplored areas include the foundations, the underside of the floor slabs, and the roof trusses. With respect to the roof, PSI stated: "No documentation was available for our review to determine the building's actual roof system. The type and quality of installation of underlying components of the roof membranes could not be determined without intrusive investigation and testing." Reporting on the accessible parts of the jail's superstructure, PSI did observe some evidence of water intrusion. By the same token, however, PSI "did not observe signs of visible distress" to the superstructure. Reporting on the exterior walls, PSI stated: "No major signs of concrete spalling or cracking could be seen during our site visit, except for a few isolated locations, such as at/and around concrete scuppers, at some eaves and soffits, and column capitals and architectural decorative stone features at the south elevation." PSI also acknowledged reports that "the building satisfactorily resisted the 1989 Loma Prieta earthquake without damage."

In determining that preservation of the jail was impractical, the County relied on Cartier's report for evidentiary support. Cartier's report mentions retention and adaptation as an alternative mitigation. But it notes that such a course for the jail "may be impractical due to its age and condition (e.g., its roof problems, deterioration of the concrete construction, specific design for secured incarceration, and its lack of compliance with current building codes)." The apparent basis for Cartier's assessment of the jail's condition is PSI's report. But as we explained above, that report is not definitive on the question of the jail's structural condition, much less on the need for demolition.

At the public hearings, several speakers urged the County to further explore alternatives to demolition, such as adaptive reuse. Muñoz argued for further study of "all the options that we could have on the building." Norris asserted that "a qualified historic architecture engineer needs to be brought in to assess the potential for remodeling the structural reinforcement." Sales

observed that "an EIR will require that viable reuse be examined." That refrain is repeated in the final addendum to Carey & Company's historic monograph, which states: "A question has arisen as to whether the existing building can be rehabilitated. It is Carey & Co.'s opinion that a study of this nature would involve reopening the environmental review process under . . . (CEQA). This kind of analysis under CEQA would probably be considered an alternatives analysis. Such an analysis would involve not only the feasibility of rehabilitating the existing building, but also other options such as moving the building, rehabilitating and adding on to the building, and doing nothing. One of the alternatives would probably have to be one that is environmentally superior to the proposed project. In this case that would be preserving and rehabilitating the building as a jail or for a new use, such as county offices."

The foregoing evidence discloses the need for further investigation of alternatives to demolition.

As a legal matter, the County erred in proceeding without benefit of a full environmental impact report. One function of an EIR is to address the adequacy of proposed mitigation measures. (Guidelines, § 15126.4.) Another function is to consider alternatives to the project. (Guidelines, § 15126.4.) Neither was fully explored here. In cases like this, an "EIR is required to identify and examine the full range of feasible mitigation measures and alternatives to demolition. [Citation.]" (*City of Oakland, supra,* 52 Cal.App.4th at p. 909.) By instead certifying the mitigated negative declaration, the County failed to proceed in the manner required by law. (*Ibid.*)

## CONCLUSION

Based on our independent review of the entire administrative record, we find that plaintiffs have carried their burden of citing to substantial evidence that supports a fair argument that the Old Jail is an historic resource, that its demolition will have a significant environmental impact, and that the proposed mitigation measures are inadequate to reduce that impact to insignificance. Based on that finding, and given the low threshold required for initial preparation of an EIR and the legislative preference for resolving doubts in favor of full environmental review, we conclude that this case must be remanded for preparation of an environmental impact report.

## DISPOSITION

We reverse the judgment and we remand the matter to the trial court with directions: (1) to enter a judgment granting the petition, and (2) to issue a peremptory writ of mandate directing the County (a) to set aside its certification of the mitigated negative declaration for the old jail project, (b) to set

aside its approvals for demolition of the old jail, and (c) to prepare an environmental impact report in compliance with CEQA in the event it determines to pursue demolition of the old jail.

Plaintiffs shall have their costs on appeal.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.

A petition for a rehearing was denied September 30, 2004, and the opinion was modified to read as printed above.