Filed 8/10/18; pub. order 9/7/18 (see end of opn.)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

FRIENDS OF RIVERSIDE'S HILLS,

      Plaintiff and Appellant,

v.

CITY OF RIVERSIDE,

      Defendant and Respondent;

CARLTON R. LOFGREN as Trustee, etc. et al.,

      Real Parties in Interest and Respondents.

E068350

(Super.Ct.No. RIC1600523)

OPINION

APPEAL from the Superior Court of Riverside County. Sharon J. Waters, Judge. Affirmed.

The Law Offices of Abigail Smith and Abigail A. Smith for Plaintiff and Appellant.

Office of the City Attorney, Gary G. Geuss, Kristi J. Smith, and Anthony L. Beaumon for Defendant and Respondent.

Claremont Land Group, Geralyn L. Skapik, and Mark C. Allen III for Real Parties in Interest and Respondents.

Real parties in interest Carlton and Raye Lofgren, as Trustees of the Lofgren Family Trust and the Lofgren 1998 Trust (the Lofgrens), sought a residential development permit to build six single-family homes on a parcel of just over 11 acres in Riverside. After respondent City of Riverside (the City) approved the permit and issued a negative declaration stating the development did not require environmental review under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.), Friends of Riverside's Hills (FRH) filed a petition for a writ of mandate challenging that decision. FRH's petition alleges the City was required to conduct a CEQA Environmental Impact Review (EIR) of the development because it violates certain land use provisions in the City's municipal code. FRH's petition also alleges the City abused its discretion by approving a project that violates its own land use provisions. The trial court denied FRH's petition, and FRH now argues that ruling was error. Because we find no evidence of the alleged land use violations, we will affirm the judgment.

# I

## FACTUAL BACKGROUND

### A.    *The Relevant Land Use Provisions*

The project site is a parcel of undeveloped land off the north side of Arlington Avenue, between Royale Place and Hawarden Drive, near Victoria Avenue. The parcel falls within the City's "Residential Conservation Zone" (RC Zone), an area established by voter initiatives to protect "prominent ridges, hilltops and hillsides, slopes, arroyos, ravines and canyons, and other areas with high visibility or topographic conditions that warrant sensitive development from adverse development practices." (Riverside Mun. Code (RMC), § 19.100.010.B.) The City's municipal code contains unique standards for residential developments located in the RC Zone. In addition, different standards apply within the RC Zone depending on whether the development is a standard or "conventional" development versus a "Planned Residential Development" (PRD). In this case, the Lofgrens have proposed to build a PRD, not a conventional development. Relevant here are the conventional and PRD standards for lot size (the required minimum acreage for each lot within a subdivision), "dwelling density" (the number of lots/homes permitted within a subdivision, measured per gross acre), and lot coverage (the percentage of the lot each home is allowed to occupy). (RMC, § 19.100.040.A.)

For conventional subdivisions in the RC Zone, minimum lot size depends on the "average natural slope" of the lot.[1]  Lots with an average natural slope of 15 to 30% must be at least two acres, whereas lots with an average natural slope over 30% must be at least five acres.  (RMC, § 19.100.050.A.3.b-c.)  The idea being, the steeper the land, the larger the lot.

The maximum dwelling density for a conventional subdivision is half a home per gross acre of the entire parcel—or one home per two acres.  (RMC, § 19.100.040.A.)  To illustrate, a 40-acre residential subdivision in the RC Zone could have up to 20 homes (or lots), whereas a 10-acre subdivision would be limited to five homes.[2]  Comparatively, the RC Zone is one of the less dense zones in the City.  For example, the dwelling density of zone R-4 (also called the Multiple-Family Residential Zone) is 40 homes (or lots) per gross acre.  (RMC, § 19.100.040.B.)  Finally, as for lot coverage, there is no coverage limit for conventional RC Zone subdivisions, meaning homes and yards may occupy the entire lot, leaving no natural terrain preserved in open space.  (RMC, § 19.100.040.A.)

---

[1]  "Average natural slope" is the "average natural inclination of the ground surface of a lot or parcel expressed as a percent," and "shall be computed from photogrametric maps, grading permit plans and other data or evidence approved by the [City's] Public Works Department."  (RMC, § 19.100.050.C.)

[2]  The municipal code expresses the RC Zone's dwelling density as 0.5 du/ac, where "du" stands for "dwelling unit."  The code defines a single-family dwelling unit as a "dwelling designed for occupancy by one family and located on one lot delineated by front, side and rear lot lines"—in other words, a home.  (RMC, § 19.910.020.A.)  The code defines "gross acreage" as the "total land area in acres within a defined boundary including any area for public rights-of-way, public streets and dedications of land for public use."  (RMC, § 19.910.020.A.)

4

If a subdivision qualifies as a PRD, however, the municipal code allows for deviation from these conventional standards. (RMC, § 19.780.010.) A PRD permit gives a developer the "flexibility" to create "small-lot infill subdivisions in existing single-family neighborhoods, thereby allowing a more efficient and creative use of often difficult to develop properties." (RMC, § 19.780.010.A.1.c.) Unlike conventional subdivisions, PRDs "promote clustering of lots on less sensitive portions of the property to preserve valuable open space and wildlife habitat" and "promote the preservation of viewscapes and low impact development." (RMC, § 19.780.010.A.2.a, c.) A PRD permit allows a developer to deviate from conventional standards in two main ways: (1) smaller minimum lot sizes (in a PRD, the minimum lot size, regardless of average natural slope, is half an acre) and (2) higher density subdivisions (more homes per parcel than in a conventional subdivision).

To qualify for a PRD permit in the RC Zone, an applicant must satisfy eight criteria, two of which are relevant to this case—(1) retain the unique natural features of the site, including arroyos, hillsides, and rock outcroppings, in natural open space areas consistent with the grading ordinance; and (2) remain sensitive to the natural topographic and habitat features of the site when placing buildings, "including [by] clustering [] homes in less sensitive and less steep locations in order to preserve such natural features and valuable natural open space, both for wildlife habitat and visual aesthetic purposes." (RMC, § 19.780.050.A.2.a-h.)

5

If the applicant satisfies the eight criteria and obtains a PRD permit, the lot size standards for conventional developments discussed above no longer apply. Instead, "lots shall be a minimum of one half (1/2) acre in size and clustered in the less steep portions of the site." (RMC, § 19.780.060.C.1.) The applicant may choose to stop there, after obtaining the ability to develop smaller lots. If so, then the PRD "benchmark density" applies to the subdivision. The PRD benchmark density is the same density as the maximum density for conventional subdivisions—0.5 du/ac (or, one home for every two acres in the subdivision). (RMC, § 19.780.050.B.) If using the benchmark density, the applicant must prepare a "conventional subdivision map," which determines the "actual number of lots that could be achieved" in the PRD "based on the average natural slope." (RMC, § 19.780.050.B, fn. 3.) Thus, the average natural slope dictates the *benchmark* density for a PRD. Take for example a proposed PRD of a 10-acre parcel in the RC Zone. If the average natural slopes of the lots are between 15 and 30%, each lot must be at least two acres, meaning a maximum of five lots could fit in the 10-acre subdivision. But if all of the slopes are, say, over 30% the lots must be at least five acres, meaning only two lots could fit in the 10-acre subdivision. This process of determining benchmark density establishes the allowable *number* of lots only, it does not dictate lot size. Thus, in the example of the 10-acre parcel with lot slopes greater than 30%, while the benchmark density limits the subdivision to two lots, those lots may be as small as half an acre (they need not be a minimum of five acres) because the developer has obtained a PRD permit.

6

If, however, the applicant does not wish to be constrained by the benchmark density and desires flexibility to build additional lots, they may choose to take the additional step of obtaining a "density bonus," which increases the density from 0.5 to 0.63 du/ac. To qualify for the density bonus, the proposed development must: (1) preserve in open space the unique natural features and steeper portions of the property and cluster the lots in the less steep portions of the site; (2) appoint a recognized conservation group to manage and maintain all designated open space areas; and (3) achieve at least six of the 11 "Superior Design" elements listed in RMC section 19.780.050.E.1.b, which seek to promote environmentally conscious design aspects like solar energy, solar reflection, natural shading, permeable paving, and drought-tolerant landscaping. (RMC, § 19.780.050.E.2.) Taking again the example of the 10-acre subdivision with an average natural slope between 15 and 30%, if the applicant obtained the density bonus they could add a sixth lot to the development, and each lot could be as small as half an acre.

B. *The City Approves the Lofgrens' PRD Permit Application*

1. *The application*

In November 2013, the Lofgrens submitted an application to the City's planning commission for a PRD permit to subdivide 12.41 acres into seven lots. The Lofgrens hired Christiansen & Company, a professional engineering firm, to survey the site and prepare the application. The initial tentative tract map submitted with the application (the "first tract map") depicts a 12.41-acre parcel consisting of 4.85 acres of dedicated open

7

space, plus seven lots (each over half an acre) clustered around a street ending in a cul-de-sac. This map did not contain any slope data.

## 2. *Planning commission's review and recommendations*

The City's planning commission reviews PRD permit applications and submits a recommendation to the City. (RMC, § 19.650.020.) In May 2015, after reviewing a memo prepared by staff, the planning commission unanimously voted to recommend the City approve the Lofgrens' PRD permit application (subject to various conditions of approval) and issue a CEQA negative declaration for the project. In support of its recommendation, the planning commission submitted to the City its staff memo, which included as attachments a tentative tract map, various aerial photographs of the site, and recommended conditions for permit approval. The tract map (the "second tract map") was identical to the first tract map, except that the total site area was revised to reflect 11.61 acres instead of 12.41 acres and this map contained average natural slope data for each individual lot, with the lowest slope being 10.3% (Lot 7) and the highest being 22.4% (Lot 5). The tentative tract map also listed seven items as "Mandatory Project Requirements," which, if implemented, would satisfy the PRD density bonus requirements. (RMC, § 19.780.050.E.2.) Six of the requirements related to the "Superior Design" elements listed in RMC section 19.780.050.E.1 and the seventh requirement was to "[a]ppoint a recognized conservation group to manage and maintain all designated open space areas." Every map the Lofgrens submitted during the approval process contained these seven requirements.

8

The staff memo described the project site as "undeveloped" and "covered with scattered brush, rock outcroppings, boulders and natural ground covers." "The site has frontage on Arlington Avenue, a major arterial street, and is surrounded by existing residential development and vacant land." Staff wrote, "The project is designed to preserve the natural terrain of the property as overall site disturbance is minimized, thereby reducing grading impacts and meeting the Hillside/Arroyo Grading requirements found in Section 17.28.020 of the Riverside Municipal Code. The project has been reviewed for compliance with all applicable development and subdivision standards and was found to be compliant. No variances are required in conjunction with this project. [¶] The subdivision proposes a clustering of lots on less sensitive portions of the property to preserve valuable open space and wildlife habitat clustered in the less steep portions of the site, and to promote the preservation of viewscapes and low impact development. Additionally, each lot will be provided private open space in addition to the substantial portion of the site dedicated toward natural open space."

Staff recommended conditions for permit approval built in compliance with PRD standards for residential developments in the RC Zone. First, and in general, staff recommended requiring that "[a]ny future development" on the project site "shall comply with all development standards of the RC-Residential Conservation Zone . . . at the time such development is submitted for permitting." Second, *as a condition to obtaining a grading permit*, staff recommended requiring the Lofgrens to: (1) record a final tract map and (2) "provide evidence that unique natural features and steeper portions of the

9

property are being preserved in open space, with lots clustered in the less steep portions of the site." Third, *as a condition to obtaining a building permit*, staff recommended requiring the Lofgrens to "provide in writing which six of the standards listed in [RMC] Section 19.780.050.D.1.b (Density Bonus for Superior Design) the project will comply with in order to receive a Density Bonus." The condition went on to require, "Evidence of compliance with the selected standards shall be submitted to Planning Division Staff for review and acceptance. Should the applicant not be able to fulfill the minimum number of standards, the project shall return to the Planning Commission for revision and the maximum density possible for the project shall be limited to 0.5 dwelling units per acre." Finally, the recommended conditions included the requirement that "a Homeowners Association" maintain the "trail and open space as designated on the map." However, this appears to be boilerplate language staff inadvertently left in the conditions because the memo—to which the conditions were attached—recommends requiring that "the proposed 4.85 acre open space . . . be managed by a recognized conservation group" as a condition to obtaining the density bonus.

Staff also attached to its memo an Environmental Initial Study for the development to support its recommendation to issue a CEQA negative declaration—a document indicating the project does not require an EIR because it poses no potentially significant environmental impacts. (See CEQA Guidelines, Cal. Code Regs., tit. 14, § 15063, subd. (b)(2) (Guidelines) [If there is "no substantial evidence that the project or any of its aspects may cause a significant effect on the environment," the agency prepares

10

a negative declaration].)  Relevant here, the study concluded the project would have no substantial adverse impact on aesthetics or biological resources and would not conflict with any land use or zoning provisions that had been "adopted for the purpose of avoiding or mitigating an environmental effect."

3.      *The City's review, FRH's comments, and permit approval*

Initially, the City planned to vote on the Lofgrens' permit application at its June 2015 meeting.  However, the City continued the matter to its August 2015 meeting after receiving an email from FRH requesting a conventional subdivision map for the development.  FRH reminded the City of the RMC provision stating that a PRD's benchmark density "shall be determined by the preparation of a conventional subdivision map in conformance with the RC Zone standards to show the actual number of lots that could be achieved based on the average natural slope."  (RMC, § 19.780.050.B, fn. 3.) FRH argued that without the conventional subdivision map, the City could not determine the *number* of lots allowable under the benchmark density before application of the density bonus.

In response to FRH's concern, the Lofgrens prepared a conventional subdivision map (the "first conventional map").  This map reflected a total parcel area of 12.36 acres (despite the fact the second tract map had revised the total parcel area to 11.61 acres) and divided the parcel into six lots of relatively equal size, with the largest being 2.03 acres and the smallest two acres.

11

In advance of the August 2015 meeting, the City's planning division staff prepared a memo discussing the first conventional subdivision map and recommending the City approve the project. The report stated: "The applicant prepared the attached 'conventional' subdivision map concept, which shows that six lots could be plotted on the subject 12.41 acre property and meet development standards of the RC Zone, while maintaining a [benchmark density of 0.50] dwellings per acre. However, the conventional subdivision concept does not preserve open space and natural terrain; therefore there is justification to allow for a PRD project that clusters lots [and] preserves open space and the natural terrain. [¶] The proposed subdivision includes clustering of lots on the less sensitive portions of the property, so as to preserve valuable open space and wildlife habitat. The clustering of the homes in the less steep portions of the site will also promote the preservation of viewscapes and low impact development. Additionally, each lot will be provided private open space, in addition to the substantial portion of the site dedicated toward natural open space. Therefore, pursuant to Section 19.780.050 (D) (2), the subdivision is eligible for a 25% density bonus, which allows an additional lot (a total of seven lots, at 0.60 dwellings per acre)." In other words, the City had determined that six was the maximum number of lots permissible under the benchmark density and that a seventh lot was permissible with a density bonus.

At the August 11, 2015 meeting, the City voted to continue the permit application to its December 2015 meeting. That same day, FRH submitted a letter to City staff opposing the project. FRH argued the parcel's total acreage was the 11.61 acres reflected

12

in the second tract map—not the 12.36 acres reflected in the conventional subdivision map—and as a result, the parcel could not support a six-lot development and still comply with the benchmark density of 0.5 du/ac. FRH argued that because the parcel was just under 12 acres (instead of just over 12 acres), the benchmark density allowed for a maximum of only five lots.

FRH raised several additional objections. It argued the project violated the zoning provision requirement that a recognized conservation group oversee and maintain the open space because the planning commission had recommended that a homeowners association take on that role. It also argued the project would require excessive grading in violation of the municipal code. FRH also observed that average natural slope data among the various maps were inconsistent, noting the planning commission's memo and report had the entire parcel's slope at 26.4% whereas the conventional subdivision map listed it as 27.3%. Finally, FRH argued the project posed potentially significant environmental impacts under CEQA because it violated the zoning and grading provisions which were enacted to protect the City's hillside areas from environmental harm.

In response to FRH's letter, the Lofgrens reduced the number of total lots from seven to six and submitted two revised maps—a conventional subdivision map (the "revised conventional map") and a tentative tract map (the "third tract map"). The revised conventional map reflected a parcel area of 11.62 acres with five lots of relatively equal size, all at least two acres. Specifically, Lot 1 was 3.37 acres with an average

13

natural slope of 21.7%; Lot 2 was 2.02 acres with an average natural slope of 27.2%; Lot 3 was 2.0 acres with an average natural slope of 27.3%; Lot 4 was 2.0 acres with an average natural slope of 20.8%; Lot 5 was 2.0 acres with an average natural slope of 15.2%. The average natural slope of the entire parcel was listed as 23.7%. The third tract map now showed six (instead of seven) smaller lots—each more than half an acre but less than two acres—clustered around a street ending in a cul-de-sac. The total parcel area was listed as 11.61 acres and the average natural slope of the parcel was 27.3%. The revised six-lot (i.e., bonus density) specs were: Lot 1 was 0.64 acres with an average natural slope of 21.1%; Lot 2 was 0.81 acres with an average natural slope of 21%; Lot 3 was 0.64 acres with an average natural slope of 26.3%; Lot 4 was 1.1 acres with an average natural slope of 29.5%; Lot 5 was 0.82 acres with an average natural slope of 29.1%; and Lot 6 was 1.15 acres with an average natural slope of 25.2%.

In advance of the December 15, 2015 meeting, planning division staff submitted a memo recommending approving the Lofgrens' application based on the revised data and reduced number of lots. The memo explained that FRH had "questioned the methodology previously utilized in justifying the prior version of the subdivision, which proposed seven residential lots," and as a result of this comment, "an error was identified and the project was revised to reflect six lots." Also in response to FRH's letter, the memo noted that staff had revised the conditions for approval to delete the reference to open space maintenance by a homeowners association and replace it with the requirement that "All designated open space areas shall be managed and maintained under the

14

stewardship of a recognized conservation group with an endowment to fund such stewardship entirely."

Staff concluded it was unnecessary to return the application to the planning commission for additional review because the commission checked for compliance with the City's zoning provisions and General Plan and the revisions did not threaten to violate either. Because the number of lots had decreased, the project had "less potential to impact the surrounding neighborhoods or natural environment." Staff also observed the revisions "did not change the alignment or orientation of streets, overall configuration of lots, or significantly alter[] the extent of land that will be preserved or developed."

On December 14, the day before the City's meeting, FRH submitted another letter, noting that although the project had "improved" because it now met the benchmark density, FRH was still opposing it. FRH's main objection was its belief the project did not cluster the lots in the less steep portions of the site. FRH also objected that because the average natural slope of the individual lots and the parcel varied from map to map, it was impossible to tell which minimum lot size applied for the benchmark density—two or five acres.

The City's Planner, Ted White, submitted a memo responding to FRH's letter in advance of the City's meeting. The memo said planning division staff had reviewed FRH's December 14 comments and the revised conventional map and concluded "the current version of the [conventional] map is compliant with [] all applicable development standards and policies pertaining to Planned Residential Developments in the RC Zone."

15

The memo concluded the revised conventional map complied with the benchmark density because each of the five lots had an average natural slope somewhere between 15 and 30% (which meant a minimum lot size of two acres, for benchmark density purposes). The memo also concluded that, contrary to FRH's claim, the project would in fact cluster the lots on less steep and less sensitive portions of the site.

At its December 15, 2015 meeting, the City voted to grant the Lofgrens' PRD permit application to develop the site based on the third tract map (the one depicting the bonus density scenario of six clustered lots of more than half an acre but less than two acres)—subject to various conditions. The City's conditions were identical in all relevant regards to the planning commission's recommendations, with the exception that the City fixed the seemingly inadvertent error regarding open space management and replaced the reference to "Home Owners Association" with a "recognized conservation group with an endowment to fund such stewardship entirely." The final condition states, "This project shall fully and continually comply with all applicable conditions of approval . . . . Failure to do so will be grounds for Code Enforcement action, [permit] revocation or further legal action."

The City also determined the project did not pose significant environmental impact based on the findings in the Environmental Initial Study, and voted to adopt a CEQA negative declaration.

C.    *FRH's CEQA Petition and the Court's Ruling*

FRH filed a petition for writ of mandate against the City as respondent and the Lofgrens as real parties in interest, asking the trial court to set aside the City's negative declaration and permit approval and to require the City to conduct an EIR.  FRH alleged the project posed significant environmental impact because it violated land use provisions in the municipal code by:  (1) "fail[ing] to cluster the proposed [lots] in a manner which develops less steep portions of the site and retains natural features"; (2) proposing excessive grading of the site; and (3) failing to obtain a variance for the lots smaller than two acres.  As an alternative basis for setting aside the PRD permit, FRH argued the City abused its discretion when it approved a permit for a project that (1) failed to provide substantial evidence the average natural slopes of the lots were between 15 and 30% and (2) deferred the selection of bonus density superior design elements to the grading permit stage.

At the hearing on the petition, the trial court stated its tentative decision to enter judgment in favor of the City on the ground there was no evidence the project violated any of the identified land use provisions.  The court subsequently denied the petition in its entirety, and FRH timely appealed.

17

# II

## DISCUSSION

FRH contends the trial court erred in denying its petition because the administrative record contains sufficient evidence of the alleged land use violations. We disagree.

### A.    *FRH's CEQA Claim Fails*

"The fundamental purpose of CEQA is to ensure 'that environmental considerations play a significant role in governmental decision-making' [citation]." (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 797.) "CEQA review procedures can be viewed as a '"three-tiered process."'  [Citation.] The first tier requires an agency to conduct a preliminary review to determine whether CEQA applies to a proposed project.  [Citation.]  If CEQA applies, the agency must proceed to the second tier of the process by conducting an initial study of the project.  [Citation.]  Among the purposes of the initial study is to help 'to inform the choice between a negative declaration and an environmental impact report (EIR).'  [Citation.]  If there is 'no substantial evidence that the project or any of its aspects may cause a significant effect on the environment,' the agency prepares a negative declaration. [Citation.]  Alternatively, if '"the initial study identifies potentially significant effects on the environment but revisions in the project plans 'would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur' and there is no substantial evidence that the project as revised may have a significant effect

18

on the environment, a mitigated negative declaration may be used.'" [Citation.] Finally, if the initial study uncovers 'substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the environment' [citation], the agency must proceed to the third tier of the review process and prepare a full EIR (environmental impact report)." (*Save Our Big Trees v. City of Santa Cruz* (2015) 241 Cal.App.4th 694, 704-705.)

CEQA requires an agency to prepare an EIR for a project "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1134-1135.) "'[C]onflict with any applicable land use plan, policy, or regulation . . . *adopted for the purpose of avoiding or mitigating an environmental effect*'" qualifies as an environmental impact under CEQA. (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 929 (*Pocket Protectors*), italics added, citing Guidelines, appen. G, § IX, subd. (b).) The residential RC Zone standards at issue here were adopted "to protect prominent ridges, hilltops and hillsides, slopes, arroyos, ravines and canyons, and other areas with high visibility or topographic conditions that warrant sensitive development from adverse development practices, [including by] . . . prevent[ing] the construction of slopes inadequately protected from erosion, deterioration or slippage; and . . . conserv[ing] the City's natural topographic features." (RMC, § 19.100.010.B.) Because the stated purpose of the standards is to preserve the City's topographically sensitive areas and protect them from erosion and

deterioration, we conclude that a conflict with those standards constitutes an environmental impact under CEQA. (Cf. *Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 695 [concluding no environmental impact under CEQA where conflict was with land use provisions adopted to achieve "economic development goals" as opposed to mitigating environmental harm].)

"[I]n reviewing the adoption of a negative declaration, the concern of both trial courts and appellate courts 'is whether there is substantial evidence in the record supporting a fair argument of significant environmental impact.'" (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1109.) This is commonly referred to as the "fair argument" standard and, unlike in other areas of CEQA, courts do not give deference to the agency's decision when determining whether the petitioner presented a fair argument based on substantial evidence in the record. (*Architectural Heritage Assn.*, at p. 1109; *Pocket Protectors*, *supra*, 124 Cal.App.4th at p. 928 [judicial review is de novo, with a preference for resolving doubts in favor of environmental review].) In other words, "if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect." (*Pocket Protectors*, at p. 935; Guidelines, § 15064, subd. (f)(1).) However, "[a]lthough our review is de novo and nondeferential, we must give the lead agency the benefit of the doubt on any legitimate,

20

disputed issues of credibility." (*Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327, 331.)

Substantial evidence to support a fair argument of environmental impact is "'"enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached."'" (*Pocket Protectors*, *supra*, 124 Cal.App.4th at p. 927; Guidelines, §§ 15088.5, subd. (a), 15384, subd. (a).) Substantial evidence "include[s] facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (Guidelines, § 15384, subd. (b).) In other words, evidence of environmental impacts must be founded upon *facts* in the administrative record, it cannot be based on "[a]rgument, speculation, unsubstantiated opinion or narrative, [or] evidence which is clearly erroneous or inaccurate." (*Id.* at subd. (a); *Pocket Protectors*, at p. 927.)

Here, the record contains no evidence of any land use violations. Two of FRH's claims are that the development *might* violate RC Zone standards in the future, if the development violates the PRD permit conditions—which is not a ground for preparing an EIR—and FRH's other claim misconstrues the law.

In its petition, FRH alleges the development proposes excessive grading in violation of the grading provisions in the municipal code and also fails to cluster the lots in the less steep portions of the site, which it argues is a PRD requirement. FRH argues that former Lot 7 had the lowest average natural slope (10.3%) and instead of moving one of the other lots to the area where Lot 7 used to be, the Lofgrens simply removed Lot 7

21

and left the lot configuration the same. In other words, according to FRH, there is at least one area of the site that is "less steep" (the site of former Lot 7) and the Lofgrens have not placed a lot there.

As an initial matter, the municipal code does not mandate PRD lot placement in the *least steep* portions of the site. The criterion calls for sensitivity to several factors when placing lots, not just slope. As noted above, the criterion requires developers to "[place] buildings demonstrating sensitivity to the natural topographic and habitat features of the site." One of the ways this can be done is by "clustering of homes in *less sensitive* and less steep locations in order to preserve such natural features and valuable natural open space, both for wildlife habitat and visual aesthetic purposes." (RMC, § 19.780.050.A.2.b, italics added.) As the language of the requirement makes clear, an area's slope is not the only consideration—a developer must also consider other features of the area, such as the quality of the terrain and whether it contains wildlife habitats. There may very well be terrain or habitat-related reasons for preserving in open space a portion of the parcel with a low average natural slope.

Additionally, FRH's concern over clustering is entirely speculative at this stage in the development, when the Lofgrens do not have a proposal for the final placement of the homes. That will come later, when they submit a final tract map and apply for a grading permit. On that point, the City has taken steps to ensure the project will satisfy the clustering criterion—namely, by building it into the conditions of approval. Under those conditions, the development must comply with all applicable RC Zone standards at all

22

times and, more specifically, the conditions prohibit the Lofgrens from obtaining a grading permit until they have recorded a *final* tract map and "provide[d] evidence that unique natural features and steeper portions of the property are being preserved in open space, with lots clustered in the less steep portions of the site."

FRH does not argue these permit conditions are insufficient, rather it complains there is no guarantee the development will ultimately comply with them. That is true of any project with mandatory future conditions and is no reason to require an EIR. So long as the development complies with the conditions, there will be no violation of the land use provisions and thus no ground for environmental review. However, FRH is not without CEQA recourse in the future if its concern comes to fruition and the Lofgrens propose inappropriate lot placement or excessive grading. FRH may seek environmental review at that time, on the ground that modifications to the development pose "new significant environmental impacts not considered in the . . . negative declaration." (Guidelines, § 15162, subd. (a)(1) [subsequent EIR required when "[s]ubstantial changes are proposed in the project which will require major revisions of the . . . negative declaration due to the involvement of new significant environmental effects"].) As it stands now, the development is required to comply with the land use provisions and there is no evidence it has violated or will violate them.

Next, FRH's petition alleges the Lofgrens violated the RC Zone standards by failing to obtain variances for each proposed lot, as they are all less than the two-acre minimum set forth in RMC section 19.100.050. But that provision applies to

23

conventional residential developments. The provision applying to *PRDs* states, "In order to promote clustering, lots [in a PRD] shall be a minimum of *one half (1/2) acre* in size and clustered in the less steep portions of the site. Lot sizes not in compliance with the RC Zone standards will require a variance." (RMC, § 19.780.060.C.1, italics added.) Plainly, the code applies different lot size standards to PRDs than conventional developments. And we decline FRH's invitation to interpret the phrase "not in compliance with the RC Zone standards" to refer to the *conventional* RC Zone standards instead of the *PRD* RC Zone standards. The phrase appears in a provision applicable to PRDs only and clearly refers to the immediately preceding minimum lot size standard of half an acre. We will not import the conventional minimum lot size standard into PRDs when the entire purpose of a PRD permit is to give developers the flexibility to create "*small*-lot infill subdivisions in existing single-family neighborhoods." (RMC, § 19.780.010.A.1.c, italics added.)

Finally, FRH's reliance on *Pocket Protectors* to support its CEQA claim is misplaced. In that case, unlike here, the record *actually contained evidence*—indeed ample evidence—that the proposed development violated the city's land use provisions. (*Pocket Protectors*, *supra*, 124 Cal.App.4th at pp. 931-932 [the city approved the development despite the fact the planning commission had concluded it violated various land use provisions and recommended denial].) Thus, even were we to conclude that violations of the code provisions at issue here could constitute a significant environmental impact for CEQA's purposes, the record establishes the project has not

24

violated those provisions and therefore FRH cannot make a "fair argument" that environmental review is necessary. (*Architectural Heritage Assn. v. County of Monterey*, *supra*, 122 Cal.App.4th at p. 1109.) We therefore affirm the trial court's denial of FRH's CEQA claim.[3]

B.     *FRH's Abuse of Discretion Claim Fails*

FRH also alleges the City abused its discretion by approving a project that violates the municipal code. In addition to the alleged violations we analyzed in the previous section, FRH claims the project violated the municipal code by (1) failing to provide substantial evidence the average natural slopes of the lots were between 15 and 30% and, (2) deferring the selection of superior design elements to the grading permit stage.

"'An abuse of discretion is established only if the [City] has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence.'" (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816.) "The [City] is the finder of fact and we must indulge all reasonable inferences from the evidence that would support [its] determinations and resolve all conflicts in the evidence in favor of [its] decision." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117.) This review is highly deferential, "[w]e may neither substitute our view for that of the [City's],

_____

[3] We note FRH also alleged in its petition that the project posed "aesthetic" and "biological resource" impacts requiring an EIR. Those allegations fail because they are premised on FRH's meritless claims of municipal code violations.

nor reweigh conflicting evidence presented to [it]." (*Friends of Lagoon Valley*, at p. 816.)

FRH argues the record contains insufficient evidence the average natural slopes of the lots were between 15 and 30% in order to support the benchmark density of five lots. FRH contends that because the average natural slope figures in the various parcel maps vary widely, it is possible some of the lots have average natural slopes above 30%. If that were the case, FRH argues, then those lots would have to be a minimum of five acres for benchmark density calculation, and as a result five lots would not fit within the parcel. This argument borders on frivolous. The Lofgrens' professional engineer submitted several versions of maps to the City and in none of those maps does a single lot's average natural slope exceed 30%. The data in the revised conventional map—on which the benchmark density is determined (RMC, § 19.780.050.B, fn. 3)—depicts five lots with average natural slopes between 15.2 and 27.3%. That map, on its own, constitutes substantial evidence to support the benchmark density of five lots. In other words, even if FRH had surveyed the parcel and presented independent slope data that conflicted with the Lofgrens' data, the City was entitled to find the Lofgrens' data more credible and approve a five-lot benchmark density based on their conventional map.

Finally, we reject FRH's claim the City improperly allowed the Lofgrens to defer selecting which six of the superior design elements listed in RMC section 19.780.050.E.1.b they would implement to obtain the density bonus. FRH has the facts and the law wrong. First of all, the Lofgrens *have* selected their design elements—they

listed them under a section entitled "Mandatory Project Requirements," which appears on each map they submitted to the City and planning commission. More importantly, however, the municipal code does not require PRD permit applicants to select their superior design elements prior to permit approval—probably because it is difficult if not impossible to know which building or landscaping elements are feasible until later phases of the project like grading or construction.

The trial court correctly denied FRH's abuse of discretion claim.

## III

## DISPOSITION

We affirm the judgment. FRH shall bear costs on appeal.

SLOUGH
J.

We concur:

McKINSTER
      Acting P. J.

MILLER
      J.

27

Filed 9/7/18

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| FRIENDS OF RIVERSIDE'S HILLS,<br>   Plaintiff and Appellant,<br>     v.<br>CITY OF RIVERSIDE,<br>   Defendant and Respondent;<br><br>CARLTON R. LOFGREN as Trustee, etc. et al.,<br>   Real Parties in Interest and Respondents. | E068350<br><br>(Super.Ct.No. RIC1600523)<br><br>ORDER CERTIFYING<br>OPINION FOR PUBLICATION |

THE COURT

    The request for publication of the opinion filed on August 10, 2018 is GRANTED. The opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c). It is ORDERED that the opinion filed in this matter on August 10, 2018, be certified for publication.

<u>SLOUGH           </u>
                        J.

We concur:

<u>McKINSTER       </u>
        Acting P. J.

<u>MILLER          </u>
        J.

28